[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION NATURE AND HISTORY OF PROCEEDINGS:
Eric S., Jr., whose date of birth is April 30, 1989, is a child of approximately one and one half years of age who has been in foster care for all but the first four months of his life.
On August 31, 1989 Eric was the subject of coterminous petitions filed with the court by the Commissioner of the Department of Children and Youth Services ("DCYS"). On that CT Page 144 same day an Order of Temporary Custody was issued by the court and Eric was placed in foster care. He has remained in foster care ever since.
On June 21, 1990 the child was adjudicated to be neglected and committed to the care and custody of DCYS. No action was taken by the court with respect to the termination petition, nor was it withdrawn by the petitioner. However, since there can be only a single disposition resulting from coterminous petitions,[1] and the decision of the court was to adjudicate and commit the child on the neglect petition, the termination petition will be presumed to have been dismissed by the court without finding.
On November 14, 1990 DCYS filed a new termination petition seeking to terminate the parental rights of the child's mother, Susan P., and his father, Eric S., Sr. This petition alleges, as to both parents: (1) failure to rehabilitate, (2) no ongoing parent-child relationship, and (3) acts of commission or omission.
On December 4, 1990, the day of trial, the respondents, all of whom were represented by counsel, waived any and all defects with respect to the filing of the new termination petition, and the court granted the petitioner's oral moved to include all facts to the day of trial. Also on the first day of trial, the respondent father, Eric S. Sr., voluntarily agreed to the termination of his parental rights in and to his son, Eric, Jr. The court terminated father's parental rights to Eric, Jr. on December 4, 1990 after finding that his decision had been made knowingly, voluntarily and intelligently, with the effective assistance of counsel.
On December 20, 1990, subsequent to the conclusion of the trial, the petitioner filed a motion to amend the petition to include a request for waiver of the one year requirement as to the allegation of failure to rehabilitate. This motion was opposed by the respondent mother; however, since the granting of the motion will not require additional evidence, and is not prejudicial to the respondent, the motion has been granted by the court. (See Conn. Practice Book Sect. 1029). Even if the motion had not been filed by the petitioner, the court would have waived the one year requirement, suo moto, based upon the totality of the circumstances, as being in the best interest of the child.
FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child of which CT Page 145 the court has taken judicial notice, permits the finding of the following facts:
DCYS first became involved with this family in December, 1987 when a neglect referral was received concerning allegations that Susan had left her one week old son, Patrick, with friends and was not properly caring for him. In March, 1988 DCYS was notified that Susan had left Patrick alone at a Willimantic hotel, where she was living, with a bottle of sour milk, no clothes and no diaper. The child was found to be dirty, feverish and with a congested cough. He was placed in foster care under an Order of Temporary Custody.
Subsequently, numerous services were offered to mother in an attempt to reunite her with the child but without success. Mother did not follow through with those services and, as a result, Patrick's guardianship was transferred to his maternal grandparents in December, 1989. (Exhibit #10).
Eric was born on April 30, 1988. On June 2, 1989 DCYS received a referral from a Department of Income Maintenance caseworker expressing concern that Susan did not know how to take care of the baby. Specifically, the caseworker observed that Susan did not know how to hold the child: his head was falling over; the child had a chest cold, he did not have enough clothes on, and his coloring was blue. On that same day a DCYS worker visited Susan's home and found it to be dirty and unsanitary. Mother was referred to the Visiting Nurse Association and Parenting Aid for assistance.
Over the next three months DCYS received and investigated numerous referrals concerning mother's failure to properly care for Eric. The child was being left alone, the house was unsanitary, mother did not have formula with which to feed the child, and mother was not following through with referrals for support services or keeping doctor's appointments for Eric.
On August 15, 1989 DCYS social worker Patricia Marchand observed a "rash" on Eric extending from the chest to his feet. Ms. Marchand testified that the child's skin was raw with open sores. When he was brought to the hospital for treatment the examining physician stated that the condition was caused by fecal matter being left on the child's skin.
On August 31, 1989 the child was placed in foster care under an Order of Temporary Custody. He has remained in foster care ever since that date.
Service agreements were entered into between mother and CT Page 146 DCYS in December, 1989, and March 28, 1990. (Exhibits #11 and #12). Mother's attempt to comply with the terms of the service agreements was superficial. While she engaged the services of the support groups to which she was referred, she did not follow through with their recommendations. In addition, although mother visited regularly with Eric from the time of placement in August through the middle of November, 1989, she did not visit with the child from November 21, 1989 through February 2, 1990. She offered no explanation for her lack of interest in the child during that time.
Between February and June, 1990 mother visited with the child on a regular basis at the DCYS office for one hour each week. Those visits were very stressful for the child. When the foster mother left the child he would scream, turn red and gasp for breath. Efforts by the mother to calm him were unsuccessful. He would continue to scream when mother picked him up. However, when one of the DCYS workers picked him up he would stop screaming and begin to calm down. According to Ms. Marchand that pattern of behavior took place most of the time.
Mother gave birth to a daughter, Erica, on March 29, 1990 and DCYS immediately began offering services to mother with respect to the care of this child, as well as for Eric.
After Eric was adjudicated to be neglected and committed to the custody of DCYS in June, 1990, weekly visits took place at the mother's home. The child's behavior during the home visits was better in that he did not constantly scream. However, his affect was bland and his behavior passive in contrast to his active behavior in the foster home. Ms. Marchand testified that she did not observe any parent-child relationship or interaction between Susan and the child during the home visits. Ms. Marchand stated that she has been the social worker assigned to this family since February, 1990 and during that time she has observed minimal improvement in mother's ability to use services but no significant improvement in her ability to care for Eric.
Ann Marie Daley, a DCYS social worker testified that she supervised two home visits between mother and Eric in June and August, 1990. She was surprised at the length of time the child cried when he was left with the mother. She observed no interaction between mother and child during those visits. CT Page 147
Some of the services offered to Susan in an attempt to help her develop the skills she needs to care both for Eric and for his younger sibling, Erica, have been the Visiting Nurse Association, The WIC (Women, Infants and Children) Program, Home Health Aid Service, Young Parents Program, The Mother's Group, The Parent Intervention Program, and the Hockanum Valley Counseling Program. It was suggested to mother that the one state agency which could offer her the most support and assistance given her limited ability and particular needs was the Department of Mental Retardation. Susan has refused to consider that agency as a resource. (Testimony of Ms. Marchand).
The feedback that Ms. Marchand received from those service providers was that they were frustrated in that mother made little or no progress as a result of their efforts.
Sandra Anglin of the Young Parents Program worked with mother weekly between July and October, 1990 in an effort to help her develop parenting skills for her daughter, Erica. It is clear from her testimony, which the court finds credible, that mother was not able to provide basic care for Erica.[2]
On several of her visits, Ms. Anglin found Erica to be in badly soiled diapers, to be soaked with urine, and have fecal matter on her body. Mother indicated that she did not have diapers or formula for the child. When the worker offered to take her to Catholic Charities, which provided free diapers, mother refused. She also refused assistance with her budgeting. (Testimony of Sandra Anglin and Exhibit #10).
Ms. Anglin also observed that mother did not hold, feed or burp Erica properly. Consequently the child vomited large amounts of formula and often had dried vomitus on her body. This pattern of behavior is almost identical to that observed with respect to mother's care of Eric.
On one occasion mother had to ask Ms. Anglin to test the Erica's bath water because she could not tell whether the water temperature was appropriate. On other occasions the child was found to be soaked in sweat because mother consistently left the child on uncovered plastic. On still another occasion the child was found to be covered with urine and vomit. Mother had no clean clothes for the child.
Throughout this period, mother demonstrated that she was not receptive to suggestions and instruction concerning CT Page 148 how she should care for the baby. She made no changes in the way she cared for the child or followed through with services or suggestions for assistance. (Exhibit #8).
Ms. Anglin found no improvement in parenting skills over the three months she worked with Susan. She testified that mother achieved no benefit at all from her services.
Mrs. Belske has been a licensed foster mother since 1981, has cared for twenty-five foster children and has adopted two children. She has been Eric's foster mother over the past fifteen months.
Mrs. Belske testified that when Eric was first placed with her on August 31, 1989 his skin was raw with blistering sores from his chest to his toes. He was placid, detached from his surroundings, and did not respond to anything. He now responds well to his environment and to the other siblings in his foster home, and is developing a distinct personality. While her family is not an adoptive resource for the child, Mrs. Belske believes the child to be adoptable.
The foster mother's observed that after being returned to her care following visits with the mother, Eric is often sweaty and his diaper is not changed. She believes that he is not being given proper physical care by the mother during the visits.
The testimony most favorable to the respondent was of Kathleen Bradley who is the program director for the East Conn Parent Intervention Program ("PIP"). She testified that she observed improvement in mother's parenting skills and that mother did follow through with suggestions made with respect to child care. However, having said that, she voiced the same concerns as others with respect to mother's care of Erica. She was especially concerned with Susan's failure to properly hold and feed the child. Erica has very poor head control and Ms. Bradley recommended that Susan consult with a physical therapist to help correct developing problems with the child's ability to hold her head up, but mother refused.
Ms. Bradley also observed the interaction between mother and Eric and indicated that the child was reserved. Mother appeared to be uncomfortable with Eric and waited for him to respond rather than take the initiative in their interaction. She testified that it would take an extraordinary effort for Eric to be able to bond with Susan. CT Page 149
Susan was enrolled in a weekly PIP classroom program where she could directly interact with Eric and develop hands-on parenting skills. Mother attended only three of the nine scheduled classroom sessions at PIP. Three of her absences were justifiable but she did not call to cancel or explain her absence with respect to the other three missed classes. Mother dropped out of the PIP classroom program in the Fall, 1990 even though that program would allow her much more time with Eric than just home visits.
Susan told Ms. Anglin on September 28, 1990 that she disliked the PIP classes because they discourage physical punishment of young children. She disagreed with that approach and felt that she could punish her children any way she wanted. (Testimony of Sandra Anglin).
CLINICAL EVALUATIONS:
Several court ordered psychological evaluations of mother and child were conducted by Dr. David Mantell, a licensed clinical psychologist. The court finds Dr. Mantell's reports and testimony credible, and has afforded great weight to his observations and professional opinions. "Psychological testimony is rightly accorded great weight in termination proceedings." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 667 (1979); In re Nicolina T.,9 Conn. App. 598, 605 (1987).
The first evaluation was conducted on October 31, 1989, when Eric was approximately six-months old, after he had been in foster care for two months.
Intellectually, Susan was found to be borderline or high mentally retarded. Eric was observed to be "a pleasant, easy child who showed no sign of recognition of his mother." Dr. Mantell found no evidence of an ongoing relationship between mother and child during that evaluation. He testified that his opinion following his first evaluation of mother was that her capacity for successful rehabilitation was seriously questionable. He testified that following that first evaluation he believed that mother was not likely to be capable of change through education. He felt that Susan would need an adult to live with her, to supervise her, and act as a co-parent on a full time, twenty-four hour per day, basis in order to be successful in parenting Eric.
Several of Dr. Mantell's opinions, which are found within Exhibit #3, are reproduced for emphasis. CT Page 150
The mother possesses mostly intellectual but apparently also emotional limitations that significantly interfere with her ability to develop and discharge an appropriate parental relationship.
The examiner does not believe that the mother has the intellectual or the psychological capacity to successfully undertake parenting on her own. The placement of support services into her home is not likely to be sufficient due to her difficulties with comprehension and attention span.
Dr. Mantell conducted a second evaluation of mother and child on June 18, 1990, when Eric was approximately fourteen months of age. On that occasion, in spite of Susan having visited with the child on a weekly basis, the child cried when the foster mother left the room and he would not go to Susan. Dr. Mantell found the lack of relationship between Susan and Eric was unusual in that the child should have reacted more positively to the mother given the fact that visiting was ongoing at that time. He found that the child to be bonded to the foster mother, not to the biological mother, and observed no parent-child relationship between mother and child.
Dr. Mantell testified that his observations and resulting opinions of the second evaluation were consistent with those of the first evaluation. Susan demonstrated no apparent understanding that her care of Eric had been inappropriate and harmful to him. For example, when asked about the "rash" observed on Eric in August, 1989 she said that all children have diaper rashes and that it is normal.
Dr. Mantell observed no improvement in mother's capacity to parent, and no evidence of the development of a parent-child relationship, between the first and second evaluations, a period of approximately eight months. (Testimony and Exhibit #4).
The third evaluation conducted by Dr. Mantell in this case took place on November 21, 1990. He once again found no on going parent-child relationship in effect and observed no improvement in mother's ability to parent this child. He voiced the opinion during his testimony that given the time the child has already been in foster care, and mother's limitations, allowing further time to experiment in an effort to determine whether mother can rehabilitate or establish a parent-child relationship would be harmful to the child. The following portions of the report of the last evaluation are reproduced for emphasis. (Exhibit #7).
In addition to being intellectually limited, the mother CT Page 151 appears to be characterologically immature.
 The mother is significantly limited and this evaluation again raises question about her ability to parent any child successfully and certainly to parent two children-simultaneously.
 This examination again raises serious questions about the ability of the mother to meet the needs of her child, Eric, on account of her own, apparently constitutional limitations. Those limitations appear also to be increased by some of her attitudes and practices that cut her off from the kind of assistance that she would need in order to be a successful parent.
ACTS OF OMISSION OR COMMISSION:
In order to terminate mother's parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) the Court must clearly and convincingly find that the child has been denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. (Emphasis added.).
"The evil to be avoided is any conduct on the part of the parent that would deny the child in question the care, guidance or control that would foster his well-being." State v. Anonymous, 179 Conn. 155, 164 (1979).
When considering whether the petitioner has met her burden of proof concerning alleged acts of commission or omission the court engages in a two step process. First the court determines whether the child has been denied by reasons of acts of parental commission or omission the care, guidance and control necessary for his physical, educational, moral, or emotional well-being. If such conditions exist, the court next determines whether the parental acts or deficiencies support the conclusion that the parent cannot exercise or should not, in the best interest of the child, be permitted to exercise parental rights and duties. In re Juvenile Appeal (84-AB),192 Conn. 254, 262 (1984); In re Juvenile Appeal (85-3),3 Conn. App. 194, 200 (1985). Both steps must be proven by clear and convincing evidence. (Id. at 267)
The court finds that the petitioner has proven, by clear and convincing evidence, that by acts of commission and omission Susan has denied her son the care necessary for his physical and emotional well-being, and that she would CT Page 152 continue to do so were he to be returned to her custody.
The evidence is clear and convincing that mother's failure to provide proper physical care for the child while he was in her care resulted in physical harm to Eric. The child was not simply suffering from a "diaper rash", these were open, raw sores from his chest to his feet resulting from his not being kept clean. In addition, the evidence is clear and convincing that the child has repeatedly suffered emotional trauma during his visits with Susan over a period of several months.
Susan has not developed the parenting skills which she needs to properly and safely care for this child or his siblings. A review of the history of numerous instances of mother's failure and/or inability to properly care for Eric and his siblings is demonstrative and predictive of her inability to safely care for this child. Such evidence has convinced the court that Susan has not, is not, and will not be able to provide safe care for Eric within the foreseeable future, and that Eric would be subject to continued deprivation of physical and emotional care were he to be returned to mother's care now or within the foreseeable future. That clearly would not be in his best interest. Consequently, the court finds that the petitioner has proven this ground for termination of mother's parental rights by clear and convincing evidence.
NO ONGOING PARENT-CHILD RELATIONSHIP:
Section 17-43a of the Connecticut General Statutes defines this ground as the absence of an:
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child[ren] and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child[ren]."
The evidence in this case has clearly and convincingly proven that there is no ongoing parent-child relationship in existence between Eric and his mother, and that this condition has existed for more than twelve months. The court accepts as credible the observations and testimony of Dr. Mantell, Ms. Marchand, and Ms. Daley, all of whom observed no parent-child relationship, as well as Ms. Bradley who testified that it would take an extraordinary effort for Eric to be able to bond with Susan. CT Page 153
Dr. Mantell conducted three parent-child evaluations in this case over over a thirteen month period and never observed evidence of a parent-child relationship. The court finds Dr. Mantell's observations and opinions to be persuasive.
The regular weekly visits that have taken place between mother and child are without emotional interaction. The child does not and has not for more than a year exhibited any positive reactions or responses to his mother. Indeed, his reactions have been mostly negative or at best indifferent.
The fact that there has been some contact between mother and child subsequent to his commitment until the time of trial . . . "does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year". In re Juvenile Appeal, (Anonymous),181 Conn. 638, 646 (1980). Regular weekly visits are not enough to be able to find that mother will be able to provide proper parenting in the forseeable future: In re Sarah M.19 Conn. App. 371, 377 (1989).
Even though no parent-child relationship exists, that alone is not grounds to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
The court finds it to have been proven by clear and convincing evidence that considering mother's history, and her lack of progress in establishing a positive emotional relationship with Eric over the past year, allowing additional time would not result in the establishment of a positive parent-child relationship.
This is a child of approximately eighteen months of age who has been in foster care for all but the first four months of his life. He, like all children, needs and deserves a permanent home and family with whom he can bond and feel safe and secure. Eric has waited for over a year for his mother to provide him with a home and to properly care for him. It would be detrimental to his best interest to require him to wait any longer for permanency. Eric is not bonded to his mother and, given the lack of improvement in the relationship between mother and child over the past year, it is most improbable that such bonding will ever occur. He is adoptable now but becomes less so as time goes on. Dr. Mantell testified that it would be harmful to the child's well being to require him to wait any longer for permanency. CT Page 154
The court finds it to have been proven by clear and convincing evidence that no ongoing parent-child relationship exists between mother and Eric, that to permit further time to establish a parent-child relationship would be detrimental to the best interest of the child, and that this condition has existed for more than one year.
FAILURE TO REHABILITATE:
Section 17-43a(b)(2) of the General Statutes provides for the termination of parental rights in the situation where a parent of a child who has previously been adjudicated as being neglected fails to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time said parent could assume a responsible position in the life of the child, considering the age and the needs of said child. The court finds clear and convincing evidence that Susan has not achieved such degree of personal rehabilitation.
"`Personal rehabilitation' as used in the [General Statutes 17-43a] refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Rayna M., 13 Conn. App. 23, 32 (1987); In re Migdalia M., 6 Conn. App. 194, 203 (1986).
Despite being offered extensive services and assistance by service providers for more than two years, not only with respect to Eric but also with respect to two of her other children, Susan has not developed the parenting skills necessary to be able to safely care for this child.
Eric is an infant, and like all infants requires special care. In re Carl O., 10 Conn. App. 428 (1987). In addition, at age eighteen months he is just beginning to develop socially and emotionally. At this critical stage of development Eric needs a permanent, nurturing home and environment in which to stabilize and maximize his emotional and social growth. His mother has not and will not be able to provide him with this environment within a reasonable time.
Eric is currently living with a loving foster family, but this is not an adoptive resource for the child. Time is now of the essence in providing this child with permanency in an adoptive home.
Susan's inability to care for her new child, Erica, even with support services in place, is clear evidence of her inability to play a useful parenting role in the life of Eric. Mother is treating Erica in exactly the same manner CT Page 155 in which she treated Eric. There has been no change or improvement in the inappropriate manner in which she feeds, holds, cleans or clothes Erica from the way she cared for Eric. It was that very behavior which resulted in Eric being adjudicated a neglected child.
Dr. Mantell found no evidence of any improvement in parenting skills or ability between his first and second evaluations of Susan, a period of approximately eight months. Subsequently, Dr. Mantell found no evidence of improvement in mother's ability to parent Eric during his third evaluation in November, 1990, approximately thirteen months after the first evaluation.
Given her lack of progress in the development of these minimal child care skills, the court finds it clearly and convincingly proven that mother has failed to rehabilitate within the meaning of the statute. The Court also finds that because of her borderline intelligence and prior personal history it is most unlikely that she will ever be able to develop the skills required to care for this child's needs with or without extensive support services. See: In re Juvenile Appeal (84-3), 1 Conn. App. 463, 478 (1984).
While mother's failure to rehabilitate subsequent to the adjudication of neglect in June, 1990 has existed for less than one year, the court finds that under the totality of the circumstances, especially given her history with the other two children, a waiver of the one year requirement is in the best interest of the child.
Mother has not made any real progress in her ability to care for her children since her son Patrick was removed from her care in March, 1988.
Dr. Mantell suggested that the only way mother might be able to care for Eric would be with full time live-in help. Susan has refused a referral to the Department of Mental Retardation which is the only agency that could possibly provide her with the twenty-four hour per day supervision that she would require in order to be able to care for Eric. (Emphasis added).
The court clearly and convincingly finds from the evidence that substantial and reasonable efforts have been made in an attempt to assist mother to rehabilitate without any measurable degree of success, and, based upon this history, allowing additional time and expending additional effort would be futile. Consequently, the court finds that the petitioner has proven the ground of failure to CT Page 156 rehabilitate by clear and convincing proof.
Pursuant to In Re Shavoughn K., 13 Conn. App. 91, 98
(1987), the court's required findings as to the six factors listed in Sec. 17-43a(d). are as follows:
 (1) Services offered to Susan in an effort to reunite her with her children began in 1988 with respect so her son, Patrick, and have continued to the date of trial. They included supervised visits with the child, as well as the assistance of the Visiting Nurse Association, The WIC (Women, Infants and Children) Program, Home Health Aid Service, Young Parents Program, The Mother's Group, The Parent Intervention Program, and the Hockanum Valley Counseling Program. Susan refused a referral to DMR, the one agency that could have provided her with the greatest supportive services to help her to care for her children.
 (2) Mother complied with the court orders to participate in psychological evaluations. Her compliance with court ordered expectations was reasonable but without success in developing the parenting skills needed to properly care for the child.
 (3) Eric has no positive emotional feelings for his mother and he is not bonded to her. He is, however, bonded with his foster mother and has a positive emotional relationship with her.
(4) Eric's date of birth of April 30, 1989.
 (5) Mother, with substantial assistance from numerous support individuals and groups, has made efforts to adjust her circumstances, conduct, and conditions to make it in the best interest of Eric to return to her home in the foreseeable future. However, those efforts have been dismally unsuccessful. Despite regular visits with the child over the past sixteen months there is no parent-child relationship in existence between mother and Eric. Despite regular contact with the child's caregivers and other service providers mother has made no significant gains in her ability to care for and parent the child safely and adequately.
 (6) Mother has not been prevented from establishing a meaningful relationship with her son by the unreasonable act or conduct of anyone, and her economic circumstances have not played a role in this case.
CT Page 157
DISPOSITION:
It is clear that despite substantial intervention by numerous service providers mother is not capable of meeting the needs of this child now, nor will she be in the foreseeable future.
The court clearly and convincingly finds that the best interests of this child will be served by terminating his mother's parental rights and placing him in a permanent, caring, nurturing adoptive home as soon as possible. This child, like all children, needs a permanent home and loving parents to whom he can bond and from whom he can receive the love and attention essential to his social and emotional growth and well-being.
JUDGEMENT
Having considered the foregoing, and having found by clear and convincing evidence that it is in the best interests of Eric for his mother's parental rights to be terminated so that he may be raised in a permanent, secure and nurturing environment as an adopted child, it is ORDERED that the parental rights of Susan P., in and to her son Eric S., are hereby terminated. It is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing said child forthwith in adoption, and to secure that end, the said Commissioner is further ORDERED to submit to the court in writing no later than 90 days from the date of this judgement a report as to the progress toward such adoption and thereafter to report at such times and in such form as the court may from time to time require.
Dated at Rockville this 2nd day of January, 1991.
TERENCE A. SULLIVAN, JUDGE